1
2
3
4
5

HONORABLE RONALD B. LEIGHTON

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

7

8
9
10
11
12
13
14

OCEAN GOLD SEAFOODS INC,

                Plaintiff,

    v.

HARTFORD STEAM BOILER
INSPECTION AND INSURANCE
COMPANY, et al.,

             Defendant.

CASE NO. C18-5425RBL

ORDER

15
16
17
18
19
20
21

     THIS MATTER is before the Court on two pairs of motions: Defendant Hartford Steam Boiler (HSB's) Motion for Summary Judgment [Dkt. # 74] and Plaintiff Ocean Gold's Motion for Leave to file a Second Amended Complaint [Dkt. # 76]; and Ocean Gold's Motion for Summary Judgment re: "Accident" Definition [Dkt. # 87], and HSB's "alternate" Motion for Summary Judgment on that same issue. [Dkt. # 90]. The first pair relates to *who is insured* under the policies, and the latter pair relates to whether the damage at issue was caused by an *accident* covered under the policies.

## I. BACKGROUND.

22
23
24

     Ocean Gold Seafoods LLC is a custom seafood processor. It has at least two subsidiaries, or sister companies—Ocean Cold LLC, and Ocean Protein LLC. Ocean Gold's primary facility

is located on Yearout Drive in Westport. Ocean Gold owns the fish processing equipment at the Yearout location, but Ocean Cold owns the cold storage facility and its extensive refrigeration equipment. Ocean Protein owns a separate fish meal processing facility in Hoquiam.

Ocean Gold purchased a series of HSB "Equipment Breakdown" property insurance policies beginning in 2008. As HSB points out, these are not "all risk" policies[1]; they are "named peril" policies, providing coverage for "fortuitous events [accidents] causing direct physical damage to covered property." The policies were effective from August 29 of one year to August 29 of the next. Each policy names Ocean Gold as the Named Insured, and the Yearout facility as the covered location. They do not name Ocean Cold or Ocean Protein. The policies provided Business Interruption and Extra Expense coverages, predicated on their being a covered event under the accident coverage.

In May 2016, Ocean Gold hired Hudson Technologies to recover 9000 pounds of R-22 Freon refrigerant from one of its systems, and to clean it. It intended to, and did, place the recovered Freon into the Ocean Cold refrigerated warehouse. Over the summer of 2016, the Ocean Cold facility began leaking and losing its ability to hold the required negative 20 degree Fahrenheit temperature. On September 2, Ocean Cold moved the product out of a portion of the cold storage facility because the refrigeration system could not keep the facility cold enough to preserve its contents—millions of pounds of frozen seafood. HSB claims this was a business decision, not the result of an accident. Ocean claim it was forced to move the product to avoid spoilage, and a greater loss. Some of that seafood was apparently moved to Ocean Protein's facility in Hoquiam.

---

[1] Nor are the Comprehensive General Liability policies, and they would not impose on HSB the duty to defend and indemnify Ocean Gold from third party claims.

Ocean made a claim under its HSB Equipment Breakdown policy a week later. HSB investigated and determined that the system had suffered a "breakdown" and could not maintain the required temperatures. HSB's investigator also determined that a 2001 Teikoku liquid motor pump had catastrophically failed. The record is not clear on the reason for the delay, but HSB did not pay or deny the claim, or inform Ocean Gold of its coverage position for more than a year. Ocean Gold hired its own claim consultant to investigate the loss and assist with the claim.

In October 2017, HSB paid Ocean Gold $717,000 for the failed liquid motor pump and for related business interruption and extra expenses losses under its policies[2]. In April 2018, HSB denied coverage for any other losses and Ocean Gold sued. HSB sued Hudson as a third party defendant, to recover its payment to HSB for the failed pump, affirmatively alleging that Hudson negligently or in breach of its contract caused the failure. The subrogation element of the case has been resolved by the parties to it.

HSB first seeks summary judgment on its defense that Ocean Gold did not own or control the "allegedly" damaged Ocean Cold refrigeration system, and that Ocean Gold was not legally liable for that refrigeration equipment. Thus, it claims, there is no coverage under the policies for the Ocean Cold refrigeration system, even if it was damaged by an accident.

Ocean Gold's responsive Motion to Amend seeks to add Ocean Cold and Ocean Protein as plaintiffs. It does not specifically seek to add a contract reformation claim, reforming the policy to reflect the parties' mutual intent that Ocean Cold and Protein are additional insureds. But it does argue that both it and HSB intended those entities to be insured. Ocean Gold also argues that it *did* control the equipment at Ocean Cold; its primary decision-maker (Mark

---

[2] Two identical HSB policies are at issue because the events took place between May and September, and the policy renewed in August.

1   Rydman) was also Ocean Cold's primary decision-maker. It argues that there are material

2   questions of fact precluding summary judgment on the claim that the loss was suffered by an

3   entity not entitled to coverage under the Policies.

4        The parties have also filed cross-motions on the policies' definition of "accident." HSB

5   seeks a ruling as a matter of law that the loss was not an accident, and Ocean Gold asks the Court

6   to reach the opposite conclusion. [Dkt. #s 87 and 90].

7        The Court has read all the briefing and most of the extensive evidentiary record. Oral

8   argument is not required to resolve the pending motions. It will address the pending motions in

9   logical, rather than chronological, order.

10   **II. DISCUSSION.**

11   **A.  Ocean Gold's Motion to Amend.**

12        Ocean Gold seeks to amend its complaint to add a Washington Consumer Protection Act

13   claim, based on what is claims was deceptive claims handling discovered during this litigation,

14   and for HSB's accepting premiums for risks it now claims it never intended to cover. It also

15   seeks to add Ocean Cold and Ocean Protein as plaintiffs seeking coverage under the Policies,

16   consistent with what it claims was the parties' clear mutual intent.

17        HSB opposes amendment. It argues that the motion is procedurally improper because the

18   pleadings are closed, and Ocean Gold cannot meet its burden of showing "good cause" for

19   altering the Court's Rule 16(b)(4) scheduling Order because it was not diligent in seeking to add

20   these claims or parties. It argues that amendment would be prejudicial and ultimately futile.

21        Leave to amend a complaint under Fed. R. Civ. P. 15(a) "shall be freely given when

22   justice so requires." *Carvalho v. Equifax Info. Services, LLC*, 629 F.3d 876, 892 (9th Cir. 2010)

23   (citing *Forman v. Davis*, 371 U.S. 178, 182 (1962)). This policy is "to be applied with extreme

24   liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003)

(citations omitted). In determining whether to grant leave under Rule 15, courts consider five factors: "bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint." *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011) (emphasis added). Among these factors, prejudice to the opposing party carries the greatest weight. *Eminence Capital,* 316 F.3d at 1052.

A proposed amendment is futile "if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense." *Gaskill v. Travelers Ins. Co.*, No. 11-cv-05847-RJB, 2012 WL 1605221, at *2 (W.D. Wash. May 8, 2012) (citing *Sweaney v. Ada County, Idaho*, 119 F.3d 1385, 1393 (9th Cir.1997)).

HSB correctly argues that Rule 16(b)(4)'s "good cause" standard for departing from the Court's Scheduling Order is more stringent that Rule 15's liberal amendment standard. It primarily considers the diligence of the party seeking to amend its complaint after the deadline for doing so. Although prejudice to the other party might supply additional reasons for denying the motion, if the party seeking amendment was not diligent, "the inquiry should end." *See Johnson v. Mammoth Recreations, Inc*., 975 F.2d 604, 608 (9th Cir. 1992). HSB argues that the Court's scheduling order required additional parties to be named more than a year ago, and that Ocean Gold could have and should have known about this claim back then. It points out that its January 2019 Answer lists the "named insured" affirmative defense, and points out that its counsel sent HSB a letter (in a different case) explaining that only Ocean Gold was an insured (and that the policy did not include a duty to defend against third party claims). [Dkt. # 96, Andersen Dec. at Ex. 2].

Ocean Gold argues that it did not know the facts surrounding HSB's "named insured" defense until early this year, when it took Rule 30(b)(6) depositions. It claims it was then diligent

1   in seeking to add Ocean Cold and Ocean Protein, and its CPA claims. Ocean Gold argues that its

2   proposed amended complaint would not prejudice HSB; it would not delay the resolution of the

3   case or require additional discovery or witnesses. It argues that HSB's contrary claim is belied by

4   the fact that it concedes its pending Summary Judgment Motion already addresses this very

5   issue. Ocean Gold points out that while HSB listed the "named insured" defense in its Answer,

6   and mentioned it in a coverage denial letter in a different case, it never explained in any of its

7   coverage denial letters in *this* case that it was denying coverage based on the fact Ocean Cold

8   and Ocean Protein were not named insureds under the Policies.

9        On this record, the Court is amply satisfied that Ocean Gold was diligent in discovering

10   and seeking to assert its and Ocean Cold's and Ocean Protein's proposed new claims, and that it

11   has met Rule 16's "good cause" requirement. This conclusion is bolstered by the fact that the

12   named insured defense is also at least relatively new to HSB: it paid hundreds of thousands of

13   dollars for the initial claim, which arose out of the Ocean Cold refrigeration pump failure. If it

14   never thought that claim was covered, it would not have paid it.

15        The Court is similarly persuaded that any prejudice to HSB is minimal and remediable.

16   Ocean Gold agrees that discovery is closed and HSB has already briefed and filed a motion on it

17   concedes is directly on point. If additional substantive motions are required, that can be

18   accommodated. The Court's schedule on this and most of its other cases has already been

19   dramatically altered by outside events.

20        That leaves the substantive issue: futility. HSB argues it would be futile for Ocean Gold

21   to add new parties and claims because they are subject to a motion to dismiss or for summary

22   judgment, based on the arguments already briefed, and because non-named insureds have no

23   standing to assert claims under the policies.  It argues that Ocean Gold has still not asserted a

1  mutual mistake-based reformation claim, other than to raise it in response to HSB'S motion for

2  summary judgment on the named-insured issue.

3      Ocean Gold persuasively argues that an insurance policy, like any contract, is governed

4  by the parties' intent, whether there was mutual mistake supporting a reformation claim, or not.

5  *Citing El-Ad 250 West LLC v Zurich Am. Ins. Co*., No 652964/2013, 2016 WL 124 1933 (N.Y.

6  Sup. N.Y. Cty. 2016). Whether Ocean Gold must plead a reformation claim to carry out the

7  parties' mutual intent, the claim it asserts—we and they intended to insure all the entities and

8  locations—is plausible on its face, and it could survive a Rule 12(b)(6) motion to dismiss its

9  amended complaint. The substantive merit of the claim on the factual record is discussed in

10  connection with HSB's "named insured" summary judgment motion, below.

11      Ocean Gold's Motion to Amend is **GRANTED**, including the assertion of a contract

12  reformation claim consistent with this Order.

13  **B.  HSB's "Named Insured" Summary Judgment Motion.**

14      HSB's first summary judgment motion argues that because only Ocean Gold, and not

15  either Ocean Cold or Ocean Protein, is a named insured under its Policies, any claim for loss

16  suffered by the non-named entities is not covered as a matter of law. It also argues that there was

17  not an "accident"[3] under its policy, because in order to covered, the failed equipment had to be

18  (1) at a covered location as described in the Declarations (it was), and (2) owned or leased by

19  Ocean Gold, or operated under Ocean Gold's control (HSB claims it was not; Ocean Gold claims

20  it was). HSB claims that the damaged equipment—necessarily including the liquid motor

21  pump—was not "covered property" under its Policies. It also argues that while the Yearout

---

[3] HSB's second summary judgment motion seeks a ruling that the loss was not caused by a covered "accident," at all.

1    location was listed in the declarations, the Hoquiam location (Ocean Protein) was not. Thus, it

2    argues, the loss and Ocean Gold's related Business Interruption and Extra Expense claims,

3    caused by its efforts to move product to other facilities, are not covered as a matter of law.

4         Ocean Gold argues and demonstrates that it always intended to purchase insurance for all

5    its related entities and locations. It argues that HSB's motion ignores this evidence and asks the

6    Court to deny the motion.

7         Summary judgment is proper if the pleadings, the discovery and disclosure materials on

8    file, and any affidavits show that there is no genuine issue as to any material fact and that the

9    movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. In determining whether

10   an issue of fact exists, the Court must view all evidence in the light most favorable to the

11   nonmoving party and draw all reasonable inferences in that party's favor. *Anderson Liberty*

12   *Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir.

13   1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable

14   factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether

15   the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

16   one-sided that one party must prevail as a matter of law." *Id*. at 251–52. Factual disputes whose

17   resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion

18   for summary judgment. *Id.* at 248. The moving party bears the initial burden of showing that

19   there is no evidence which supports an element essential to the nonmovant's claim. *Celotex*

20   *Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving

21   party then must show that there is a genuine issue for trial.  *Anderson*, 477 U.S. at 250. If the

22   nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving

23   party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323–24.

24

The rules and principles governing the court's interpretation of the subject insurance contract are well-settled in Washington.  As with any contract, the Court's primary goal is to ascertain the parties' intent.  The interpretation of an insurance policy is a question of law, and the policy is construed as a whole with the court giving force and effect to each clause in the policy. *Queen City Farms* v. *Central National Ins.  Co.*, 126 Wn.2d 50, 59-60, 882 P.2d 703 (1994); *see also American Star Ins. Co. v. Grice,* 121 Wn.2d 869, 874, 854 P.2d 622 (1993). The language of an insurance policy is to be interpreted in accordance with the way it would be understood by the average person, rather than in a technical sense.  *Id.*  Overall, the policy should be given a practical and reasonable interpretation rather than a strained or forced construction that leads to an absurd conclusion, or that renders the policy nonsensical or ineffective. *Transcontinental Ins. Co.  v.  Washington Public Utilities Districts' Utility System,* 111 Wn.2d 452, 456-457, 760 P.2d 337 (1988) (internal citations omitted).

HSB argues that its policies are clear and should be "enforced as written." It argues it "never assented to offering coverage to Ocean Cold or Ocean Protein."  The former claim is not accurate; on its 2010 policy, HSB was asked to and did add Ocean Cold as a named insured. It does not claim that it sought an additional premium for any additional risk.

"A mutual mistake occurs if the parties had the same intentions but their written agreement does not accurately express their intentions." *GLEPCO, LLC v. Reinstra*, 307 P.3d 744, 752 (Wash. Ct. App. 2013). Under Washington law, mutual mistake can be grounds for reformation, an equitable remedy that brings a writing that is materially different from the parties' agreement into conformity with that agreement. *Id*. "A party seeking reformation must prove the facts supporting it by clear, cogent, and convincing evidence." *Id*. (citing *Akers v. Sinclair*, 226 P.2d 225, 231 (Wash. Ct. App. 1950)).

There is ample evidence supporting the claim that Ocean Gold always believed that all its entities and locations and equipment were covered by the HSB policies. There is evidence that HSB similarly intended to insure at least the entire Yearout facility. During its 2010 Ocean Gold policy, Ocean Gold's agent (Kibble & Prentice) informed HSB that "Ocean Gold actually has several entities, and some are responsible for certain locations. Please add [Ocean Cold Seafoods Inc, (1601 Yearout Drive)] to this coverage." HBS's underwriter, Jackie Pineda, promptly added "Ocean Cold, LLC" to that 2010 policy, without charging any additional premium. [Dkt. # 77 at Ex. F]. Ocean Gold claims, without serious rebuttal, that it since renewed its policy on the "same terms" each year, up to and including the policies at issue.

HSB's claim that the 2010 policy is of no moment is therefore not accurate. It is a part of the story, and a part of the parties' course of dealing. It is strong extrinsic evidence that the policy HSB issued wasn't what its insured intended. HSB also listed Ocean Cold's facility—a 95,000 square foot cold storage warehouse full of millions of pounds of frozen seafood—on its "Schedule of Locations" and its 2016 "Statement of Values," suggesting that it was calculated into the premiums it accepted. Indeed, it first added Ocean Cold's location to the Schedule of Locations in response to the 2010 request to add Ocean Cold, and that location remained in the subsequent policies, even if Ocean Cold's name did not. The parties do not directly address the policies' limits—$37,000,000—but it seems unlikely that that coverage amount was for potential losses that did not include the on-site cold storage facility and its up to 20 million pounds of seafood.

Furthermore, Ocean Gold has supplied evidence from which a reasonable fact finder could find that until this litigation, HSB believed it insured—because it *intended* to insure—the Yearout facility in its entirety. After the loss, but before the litigation, HSB investigated Ocean

Gold's claim for an "accident" involving a "2001 Teikoku liquid motor pump." It determined that the pump's failure "directly resulted from a covered cause of loss," and it paid Ocean Gold more than $700,000. [HSB's Motion, Dkt. # 74, at 8]. Yet it relies heavily on Ocean Gold's admission that the refrigeration system of which that pump was a component was "owned 100% by Ocean Cold" to claim that the loss was *not* so covered, as a matter of law.

A reasonable jury could find that both Ocean Gold and HBS intended to insure the entire Yearout facility, and all the entities operating there, and that they both discovered the current policies had not done so only after this lawsuit was commenced. There is evidence from which a reasonable jury could find that both parties were honestly mistaken about who and what was insured.

In these respects, this case bears little resemblance to *West Coast Pizza Company, Inc. v. United National Ins. C*o., 166 Wn. App. 33 (2011), upon which HSB primarily relies. Unlike the insured there, it makes no sense for Ocean Gold (or HSB) to intentionally exclude the subsidiaries from its insurance, especially after the insured successfully added one of them at no additional cost early on in its relationship with HSB, and where that other entity operates in the same physical space, through the same human decision-maker. Ocean Gold was present at the Yearout facility in the form of Mark Rydman, who was also there as Ocean Cold. This fact not only supports the reasonableness of Ocean Gold's belief and intent about which of its entities was insured, but by itself creates a question of fact as to whether Ocean Gold "controlled" the refrigeration system owned by its 100%-owned subsidiary, Ocean Cold.

HSB's Motion for Summary Judgment on its claim that only Ocean Gold is a named insured, and the damaged equipment was not covered property under its Policies, is **DENIED**.

**C.  The "Accident" Cross-Motions for Summary Judgment.**

The second pair of motions involve a more common insurance dispute, over the policy's coverage and the cause of any loss. Ocean Gold claims that contaminated Freon caused a covered breakdown of the Ocean Cold mechanical refrigeration system, which in turn required it to move product other facilities to avoid spoilage. It seeks a summary judgment declaration that the refrigeration system's failure was a covered "accident" under its HSB insurance policies.

HSB seeks summary judgment on its claim that the losses are not covered. HSB argues that its policies covered "fortuitous mechanical breakdowns causing physical damage to covered equipment," not components of a refrigeration system that worked, if sub-optimally, due to contaminated R-22 Freon refrigerant. It argues that Ocean Gold elected to move its product because its system could not maintain the desired temperature. It pithily claims its policy is "not a warranty on the operability of freezers."

Both parties dedicate portions of their briefing on these second motions to reiterating or revising their arguments about whether any accident caused damage to "*covered* property," an issue that is discussed and resolved above. This second version of the "accident" dispute relates to whether a refrigeration system damaged by contaminated Freon (and ensuing business interruption losses and extra expense) is covered under the HSB's Equipment Breakdown policies Ocean Gold purchased.

The summary judgment standard and the general rules for insurance policy construction are discussed above. If an insurance policy is clear and unambiguous, a court must enforce it as written and may not modify it or create ambiguity where none exists. *See McDonald v. State Farm Fire & Cas. Co.*, 119 Wash.2d 724, 733, 837 P.2d 1000 (1992). Ambiguity exists when a clause, on its face, it is fairly susceptible to two interpretations, both of which are reasonable. *See Morgan v. Prudential Ins. Co.*, 86 Wash.2d 432, 435, 545 P.2d 1193 (1976). When analyzing a

1   policy and determining whether an ambiguity exists, a court may not engage in a "'strained or

2   forced construction' that would lead to absurd results," nor may it "interpret [the] policy

3   language in a way that extends or restricts [it] beyond its fair meaning or renders it nonsensical

4   or ineffective." *Christal v. Farmers Ins. Co. of Washington*, 133 Wash. App. 186, 191, 135 P.3d

5   479, 481 (2006), *as amended* (May 23, 2006) (quoting *Morgan*, 86 Wash.2d at 434–35, 545 P.2d

6   1193)). It must apply definitions provided by the policy and give any undefined terms their plain,

7   ordinary meaning. *See Overton v. Consol. Ins. Co.*, 145 Wash.2d 417, 427–28, 38 P.3d 322

8   (2002). Any ambiguities are construed against the drafter-insurer and for the insured. *See Am.*

9   *Nat. Fire Ins. Co.*, 134 Wash.2d at 427.

10          The rule strictly construing ambiguities in favor of the insured applies with added force to

11   exclusionary clauses which seek to limit policy coverage.  Exclusions of coverage will not be

12   extended beyond their "clear and unequivocal" meaning.  *Lynott v.  Nat'l Union Fire Ins. Co.*,

13   123 Wn.2d 678, 690, 871 P.2d 146 (1994).  Indeed, where the policy language remains

14   ambiguous even after consideration of extrinsic evidence, the legal effect of such ambiguity is to

15   render the exclusionary language ineffective.  *Id.*  (Citing *McDonald v.  State Farm Fire & Cas.*

16   *Co.*, 119 Wn.2d 724, 733, 837 P.2d 1000 (1992)).

17          HSB's policy covered physical damage to covered property caused by "accidents;" if

18   there was no accident there is no coverage:

19

20

21

22

23

24

**1.   Covered Cause of Loss**

    **a.   "Accident" and "Electronic Circuitry Impairment"**

The following applies when Electronic Circuitry Impairment is shown as Included in the Declarations:

The Covered Cause of Loss for this Equipment Breakdown Coverage is an "accident" or "electronic circuitry impairment." Without an "accident" or "electronic circuitry impairment" there is no Equipment Breakdown Coverage.

[Dkt. # 88 at 17 (HSB Bates No. 0066)]. If there was an accident, HSB agreed to pay for physical damage to covered property:

**a.   Property Damage**

We will pay for physical damage to "covered property" that is at a location

indicated in the Declarations at the time of the Covered Cause of   Loss. When Electronic Circuitry Impairment is shown as Included in the Declarations, we will consider "electronic circuitry impairment" to be physical damage to "covered equipment."

[Dkt. # 88 at 17 (HSB Bates No. 0066)].

The policies defined "accident" as a fortuitous mechanical breakdown causing physical damage to covered equipment:

**1. "Accident"**

    **a.** "Accident" means a fortuitous event that causes direct physical damage to "covered equipment." The event must be one of the following:

        **(1)** Mechanical breakdown, including rupture or bursting caused by centrifugal force;

[Dkt. # 88 at 33 (HSB Bates # 0082)].

    The HSB policies include an "ensuing loss" provision, which explains that enumerated failings are not accidents, but if a fortuitous mechanical breakdown is caused by such failings, that event is nevertheless an accident covered by the policy:

    **b.** None of the following is an "accident," however caused and without regard to whether such condition or event is normal and expected or unusual and unexpected. However, if an event as defined under 1.a. above results from any of the following, it will be considered an "accident."

        **(1)** Depletion, deterioration, rust, corrosion, erosion, settling or wear and tear;

        **(2)** Any gradually developing condition;

                      \*\*\*

**(4)  Contamination by a "hazardous substance"; or**

**(5)  Misalignment, miscalibration, tripping off-line, or any condition which can be corrected by resetting, tightening, adjusting or cleaning, or by the performance of maintenance.**

[*Id*.]

In short, HSB's policies cover fortuitous mechanical breakdowns which cause direct physical damage to property or equipment covered by the policy. Wear and tear and the like are *not* covered, but if an accident *results from* the excluded causes, the accident is nevertheless covered. The excluded wear and tear itself remains *un*covered. *See,* for example, *Vision One, LLC v. Philadelphia Indem. Ins. Co*., 174 Wn.2d 501, 505, 276 P.3d 300 (2012).

HSB concedes there is "no debate" that "contaminated R-22 Freon" "attacked the Ocean Cold refrigeration system causing physical damage to O-rings, gaskets, seals, and overall deterioration of the refrigeration system, resulting in the facility's inability to maintain freezing[4] temperatures." [Dkt. # 110 at 3].  But it claims there is no coverage, because there is no evidence of a "fortuitous mechanical breakdown" at the facility (other than the liquid pump, which it paid) causing direct physical damage to covered property.

HSB argues that the term "mechanical breakdown" is "clear on its face": it means that the covered equipment must "***completely cease functioning***." Citing *American Graphics v. Travelers*, 17 Fed. Appx. 787 (10th Cir. 2001) (unpublished). It also argues that the machine or

---

[4] The system *could* maintain a temperature that was technically "freezing." But it is undisputable that Ocean Gold/Cold designed, built, insured, operated, maintained, and required a facility that could hold a temperature more than 50 degrees below that threshold.

mechanism at issue must suffer damage to its ***moving parts*** in order to be covered. Citing *Nat'l Investors Fire & Casualty v. Preddy*, 248 Ark. 320, 451 S.W.2d 457 (1970).

American Graphics unremarkably held that catastrophic damage to the insured's printing press caused by a metal cover falling into its moving parts was not covered because the policy had a "mechanical breakdown" exclusion. In *Preddy*, an air duct under a basement's concrete floor collapsed. The homeowners policy's mechanical breakdown exclusion did not apply because "mechanical breakdown is a functional defect in the moving parts of the equipment which cases the latter to cease functioning *or to function improperly*." *Id.* 451 S.W.2d at 458 (emphasis added). While these cases appear to have reached the straightforward, correct result on their facts, they do not support HSB's claims here. Indeed, HSB's "moving parts" authority disagrees with its "complete cessation" authority about whether improperly functioning equipment is covered.

HSB insists that the refrigeration system simply "would not cool as well as Ocean Gold wanted." It argues that a machine that is functioning, even sub-optimally, has not suffered a "mechanical breakdown." Citing *D.L. Lee & Sons v. Netherlands Ins*., 2008 WL 1134079 (N.D. Ga. June 25, 2008). In *D.L. Lee*, the meat-processor-insured's netting machine's wear and tear caused metal shavings to contaminate 193,000 pounds of meat product. The policy was identical to the ones at issue here. The court held that the machine had not suffered a mechanical breakdown; it worked, albeit not as well as the insured hoped. HBS argues that, like the failing machine in *D.L. Lee*, Ocean Gold's refrigeration equipment did not cease to function; it continued to operate, even if did not work as well as desired. It argues that absent a complete cessation of function of its moving parts," Ocean Gold's [Cold's] refrigeration system did not suffer a covered "mechanical breakdown," as a matter of law.

1   Ocean Gold argues that the contaminated Freon caused components of the facility's

2   refrigeration system to "fail," leading to a covered "breakdown" of the entire system. It

3   emphasizes that that HSB's own investigator, Joseph Kennedy[5], reached that conclusion. It

4   argues that losses caused by the accidental mechanical breakdown of its refrigeration system are

5   covered under the policies; that was one of its primary purposes for purchasing such a policy.

6   Ocean Gold argues that while "accident" is defined in the policy, "mechanical breakdown" is

7   not, and that that term is at best ambiguous, given HSB's insistence that it necessarily but

8   implicitly included other, far more restrictive terms. It claims that the contaminated Freon caused

9   its entire refrigeration system to break down, requiring it to move product to a facility that could

10   maintain adequate temperatures. It seeks a summary declaration that the event is covered.

11   Factually, the case is complicated. Legally, it is not, at least for purposes of these

12   motions. It is patently *not* clear from the face of the policy that "mechanical breakdowns" are

13   covered only if they involve a complete cessation of operability. The policy does not say that

14   only a mechanical system's moving parts are covered. Many insurable machines have very few

15   moving parts—computers, for example.

16   The accidental, or negligent[6], introduction of contaminated Freon into a refrigeration

17   system, causing it to fail to perform its one essential function is not analogous to a machine that

18   continues to work but, due to normal wear and tear, contaminates the product it processes with

19   metal shavings. The system lost refrigerant, and suffered damage to its control valves, pumps

20

21   _____

22   [5] Kennedy inspected the Ocean Cold facility and its refrigeration system on a yearly basis, describing it as "well-maintained." This undeniable fact is further evidence that HSB believed it insured the Ocean Cold facility; if the Ocean Cold system was never intended to be "covered," why would he be routinely inspecting it, on HSB's behalf?

23   [6] HSB sued Hudson, the entity it claimed was responsible for the pump failure, because it was negligent or in breach of its contract with Ocean Gold to properly reclaim or recover the Freon. There is no claim that anyone acted intentionally.

24

ORDER - 18

and compressors. The contaminated Freon resulted in accelerated deterioration of switches,

gaskets, seals and the like, which prevented the system for maintaining the required temperature.

That fact led to Ocean Gold's "decision" to shut off the system and move the product before it

spoiled. One of the items damaged was the Teikoku liquid pump; that pump's loss was not the

cause of the accident; it was part of the damage that the accident caused. HSB paid for that failed

component, and for the losses it claims were directly attributable to it, but it insists that the rest

of the system wasn't damaged at all, or suffered from un-covered wear and tear. It is true that

HSB did not sell its insured a "freezer operability warranty." But it is also true it didn't sell pump

insurance.

  The efficient proximate cause of a loss—the cause that starts a causal chain of losses—is

generally a factual determination to be made by the jury. *See Sunbreaker Condo. Ass'n v.

Travelers Ins. Co.*, 79 Wn. App. 368, 901 P.2d 1079 (1995). But the facts in this case do not

appear to be disputed. In a footnote, HSB suggests that the damage caused by the contaminated

Freon was predictable, though it does not contend or demonstrate that the damage was

intentional. It concedes that the damage to the pump was fortuitous, but claims that the damage

to the rest of system—evidently caused by the same contaminated Freon—was not. [Dkt. # 110

at 11]. HSB emphasizes that the broken pump did not cause the rest of the system to fail, but

Ocean Gold does not claim that it did; it plainly claims instead that the accidental, if avoidable,

introduction of contaminated Freon caused its insured refrigeration system to suffer direct

physical damage over the ensuing weeks. The failed pump is but one component of the entire,

insured refrigeration system.

  To use a car analogy, an insured who perhaps foolishly, but nevertheless accidentally,

puts diesel into his gasoline-powered truck, causing its engine to seize, has suffered a fortuitous

1  mechanical breakdown. Unlike the netting machine in *D.L. Lee*, the loss of the engine's

2  functionality was caused by an accident, not by "deterioration" or "wear and tear[7]." Those

3  exclusions would come into play where that same insured, before his truck breaks down, asks his

4  insurer for a new engine because the existing one is starting to wear out. That is not what

5  happened here. HSB's ensuing loss provision would cover for damage resulting from a fortuitous

6  mechanical breakdown caused by wear and tear, even though it does not cover the wear and tear

7  itself. Ocean Gold does not seek coverage for wear and tear; it seeks coverage for the mechanical

8  breakdown of its refrigeration system caused by the contaminated Freon (and for other resulting

9  losses covered under the policies).

10      HSB's motion for Summary Judgment on its claim that Ocean Gold has failed to

11  demonstrate that a fortuitous mechanical breakdown caused physical damage to property covered

12  by its policies is **DENIED**.

13      Ocean Gold's cross motion for a declaration that the term "mechanical breakdown" in

14  HSB's policies is ambiguous is **GRANTED**. Its motion for a declaration that its system suffered

15  such a breakdown is **GRANTED**. HSB did not seek and the Court is not granting a declaration

16  that the mechanical breakdown was fortuitous. Nor does this Order address the types or amounts

17  of damage caused by the accident. If and to the extent Ocean Gold's summary judgment Motion

18  seeks a determination as a matter of law that Ocean Cold was a named insured (the reverse of

19  HSB's first summary judgment motion) that motion is **DENIED** for the reasons discussed above.

20  / /

21  /

22

23

24

---

[7] HSB also argues that its policy does not cover damage from "hazardous substances." But even pristine R-22 Freon is a hazardous substance, as is the diesel in the hypothetical truck.

1      IT IS SO ORDERED.

2      Dated this 22nd day of June, 2020.

3

4      _____
       Ronald B. Leighton
5      United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24